UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                            :
CHEMICAL SOLVENTS, INC.                     :
                                            :        CASE NO. 1:10-CV-01902
                  Plaintiff,                :
                                            :
vs.                                         :        OPINION & ORDER
                                            :        [Resolving Doc. No. 22, 31, 36]
ADVANTAGE ENGINEERING, INC.,                :
                                            :
                  Defendant.                :
                                            :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        In this contract dispute, Defendant Advantage Engineering, Inc., ("Advantage") moves under

Federal Rule of Civil Procedure 56 for summary judgment.  [Doc. 22.]  Plaintiff Chemical Solvents,

Inc., ("Chemical Solvents") opposes the motion.  [Doc. 29.]  The Defendant replied.  [Doc. 33.]

Defendant Advantage also moves to exclude the expert testimony of Jim Gilligan under Federal Rule

of Evidence 702, which was offered by the Plaintiff in support of their opposition to summary

judgment.  [Doc. 31.]  The motion is opposed.  [Doc. 35.][1]

## I. Background

        This case stems from Plaintiff Chemical Solvent's purchase of a Titan Central Chiller Model

TI-180A, which was manufactured and sold by Defendant Advantage.  The Plaintiff is a supplier of

chemical products and provides waste disposal and recycling services to industry.  [Doc. 29 at 5.]

In 2007, upon the recommendation of Tony Datillo, an independent consultant who was hired by

Chemical Solvents, Plaintiff Chemical Solvents began considering the purchase of a large industrial

chiller.  [Doc. 23 at 7; Doc. 29 at 5.]  In March 2007, Tony Datillo spoke with a friend, Bruce Bene,

_____

[1] The Court **GRANTS** the Plaintiff's motion seeking leave to oppose the Defendant's motion to strike the
expert report of Jim Gilligan.  [Doc. 36.]

-1-

Case No. 1:10-CV-01902
Gwin, J.

about the Plaintiff's search for a chiller unit.  [Doc. 23 at 7; Doc. 29 at 5.]  Bruce Bene is an employee of BruceAir Co., a company that specializes in servicing dryers, air compressors, and other large industrial equipment.  [Doc. 29-2 at 4.]  After some conversation, Datillo asked Bene if he could help Chemical Solvents find a chiller; although BruceAir had never located a chiller that large for a client before, Bene agreed that he would assist Chemical Solvents.  [Doc. 23 at 7; Doc. 29 at 5.]

Bene soon located a chiller unit produced by Defendant Advantage that met the Plaintiff's specifications, a Titan Central Chiller, Model TI-180A-460.  [Doc. 23 at 7; Doc. 29 at 6.]  On March 2, 2007, Bene contacted Advantage to ask about the availability of Titan units; in response, Advantage told Bene that it had custom-manufactured a Titan chiller for a customer, but that the unit was ultimately never purchased and told Bene that the custom-manufactured unit was for sale.  [Doc. 23 at 7; Doc. 29 at 6-7.]  Soon afterwards, Bruce Bene arranged a meeting between Advantage and representatives from Chemical Solvents to inspect the unit and discuss a purchase price.  [Id. at 7.]  This meeting occurred at Advantage's Indiana facility.  [Id. at 7.]

After negotiations in which Bruce Bene acted as a middle man, Advantage and Chemical Solvents agreed upon a purchase price.  [Id. at 7.]  During the negotiation process, Bene asked Advantage if it would accept a negotiated price for the Titan chiller, with payment by Chemical Solvents made directly to Advantage and a commission to be paid to BruceAir by Advantage out of this sum.  [Doc. 23 at 7-8.]  Advantage refused this arrangement, and instead, Chemical Solvents paid BruceAir $134,100, of which $108,950.40 was paid to Advantage by BruceAir.  [Id. at 8; Doc. 29 at 8.]  BruceAir retained the difference as a commission.  [Doc. 29-2 at 9-10.]  As part of the purchase, Chemical Solvents received an instruction manual for the Titan Series Chillers, but did

-2-

Case No. 1:10-CV-01902
Gwin, J.

not receive a manul specific to the model chiller that was purchased.  [*Id.*]  The manual includes a provision saying that it was important to ensure that the water used in the chilling system is properly treated and saying that Advantage disclaimed all responsibility for system failure caused by inadequate water treatment.  [Doc. 23-4.]

In February 2008, Advantage shipped the chiller directly to the Plaintiff's Cleveland facility; Bruce Bene never took possession of the chiller.  [Doc. 29 at 8.]  The purchase price also included a custom plant layout and installation drawings.  [*Id.*; Doc. 29-2 at 12.]  BruceAir installed the chiller according to these plans and Bruce Bene also testifies that during the installation process that BruceAir and Chemical Solvents were in regular contact with Advantage regarding proper installation procedures.  [*Id.* at 11.]  As part of the purchase, Advantage also dispatched a representative to ensure that the chiller was properly installed and that the system was operating properly.  [*Id.* at 13.]  With the purchase, Advantage agreed to provide a one-year inspection of the chiller by an Advantage representative; it is unclear, however, whether this inspection ever occurred. [*Id.* at 14.]

The Titan chiller is a large unit designed to be part of a central circulating chilled water system.  [Doc. 29 at 3.]  The chiller had three major components:  (1) three evaporators with compressors; (2) a large water tank with circulating pumps; and (3) roof-mounted condensers.  [*Id.* at 3.]  Most important in this case, the evaporators are sealed units that contain approximately 375 copper tubes that circulate Freon, while a water based solution passes outside of the copper tubes inside of the evaporator.  [*Id.* at 6.]  The copper tubes are held in place by a number of mild steel baffles.  [Doc. 29-6.]

On March 15, 2010, just over two years after the chiller was installed, the chiller suffered a

Case No. 1:10-CV-01902
Gwin, J.

catastrophic failure without warning, rendering it wholly inoperable. [Doc. 23 at 9; Doc. 29 at 9.] The chiller unit overheated, becoming so hot that it melted tar off the roof above the chiller's water tank. [*Id.* at 9.] Due to the loss of the unit, Chemical Solvents was forced to temporarily shut down its operations and also needed to acquire and install a new chiller unit. [Doc. 1-1 at 9.]

On March 26, 2010, the Huge Heating & Cooling Company, Inc. examined the chiller and found mud and debris on the tube inlet of the evaporators. [Doc. 23 at 9.] In April 2010, Chemical Solvents sent part of the chiller unit to Condenser & Chiller Services, located in California, for additional testing. [*Id.* at 9.] This testing revealed that a hole had formed in the copper tubing in one of the evaporators adjacent to a steel baffle plate. [Doc. 23 at 10; Doc. 29 at 9.] This hole allowed Freon to leak into the chilled water, which then caused water to enter the compressors. [*Id.* at 9.] The compressors were rendered inoperable due to the leaking, causing the machine to overheat. [*Id.* at 9.] Apparently none of the fail-safe systems or alarms – supposedly equipped on the machine – triggered to shut down the machine before it completely overheated. [*Id.* at 9.]

Chemical Solvents sent the chiller to Puckorius & Associates, which conducted additional testing on the machine to determine the cause of the Freon leak. [Doc. 23 at 10; Doc. 29-6.] On August 22, 2010, Puckorius gave a report that concluded that the machine failed from corrosion in the copper piping in the evaporator. [*Id.* at 2.] Puckorius's investigation found heavy iron deposits on and around the copper tubing, especially near the steel baffles that hold the tubes together. [*Id.* at 2.] The report concluded that the machine failed from a combination of this corrosion and vibrations caused by restricted flow of water into the copper tubes. [*Id.* at 3.] The report also said that the gycol/water solution used by Chemical Solvents to prevent corrosion was either not strong enough or was ineffective. [*Id.* at 3.]

-4-

Case No. 1:10-CV-01902
Gwin, J.

The parties submit expert reports to explain the failure of the chiller.  [Doc. 20-1; Doc. 21-1; Doc. 27-1; Doc. 28-1.]  The Defendant offers the expert report of Brett Miller, a Laboratory Director and Senior Metallurgical Engineer at IMR Metallurgical Services; the Plaintiff offers the report of Jim Gilligan, director of Gilligan Technology, Inc., a company that specializes in the sale and service of industrial water treatment chemicals.  [Doc. 20-1 at 1; Doc. 21-1 at 31; Doc. 32-3.]

The Defendant's expert, Brett Miller, concludes that the chiller tubes failed from pitting corrosion on the exterior water side of the tubes.  [Doc. 21-1 at 30.]  In his inspection of the chiller, Miller observed significant corrosion on the steel shell of the evaporator and on the outside of the tubes, especially near the steel baffles.  [*Id.* at 5.]  Miller says that the type of corrosion seen was likely caused by contamination of the water in the chiller and that this type of corrosion is generally seen in low-water flow conditions.  [*Id.* at 30.]  The Plaintiff's expert, Jim Gilligan, gives the opinion that the chiller failed due to an improper design and negligent engineering.  Specifically, Gilligan testifies that the failure of the chiller was caused by galvanic corrosion between the steel baffles and the copper tubing and because of "saddle wear" created by improper copper tube support in the steel baffles.  [Doc. 20-1 at 3.] Gilligan also testifies that there was no solution of corrosion inhibitor that Chemical Solvents could have used to have prevented the type of galvanic corrosion that occurred around the copper tubes and steel baffles.  [*Id.* at 4-5.]

On July 19, 2010, Chemical Solvents filed this action in the Court of Common Pleas for Cuyahoga County.  [Doc. 1-1.]  In the complaint, Chemical Solvents asserts five causes of action, specifically:  (1) breach of contract; (2) breach of implied warranty of fitness for a particular purpose under O.R.C. § 1302.28; (3) breach of implied warranty of merchantability under O.R.C. § 1302.27; (4) breach of implied warranty under the common law; and (5) negligence for failure to perform in

Case No. 1:10-CV-01902
Gwin, J.

a workmanlike manner.  [*Id.*]  On August 26, 2010, the action was removed to the Northern District

of Ohio.  [Doc. 1.]  The Court has proper subject matter jurisdiction under 28 U.S.C. § 1332 because

the parties are diverse and the amount in controversy exceeds $75,000.

On March 4, 2011, Defendant Advantage moved for summary judgment, saying that they are

entitled to judgment as a matter of law because: (1) the Plaintiff does not give evidence showing that

a design defect caused the failure of the chiller unit; (2) the breach of contract and breach of implied

warranty claims fail (Counts 1-3) due to a lack of privity between Advantage and Chemical Solvents;

(3) the common law claims – breach of implied warranty and negligent workmanship (Counts 4-5)

– are preempted by the Ohio Products Liability Act; (4) the common law breach of implied warranty

claim (Count 4) fails because it only seeks recovery for economic loss; and (5) the negligence for

failure to perform in a workmanlike manner claim (Count 5) is not actionable under the facts that

are alleged.  [Doc. 23.]  The Defendant also moves to exclude the expert testimony of John Gilligan

from the record under Federal Rule of Evidence 702, saying that Gilligan is not qualified to provide

expert testimony and that his conclusions are based on speculation and lack the required reliability

and relevance.  [Doc. 31.]

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law." *Daugherty*

*v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).

The moving party has the initial burden of showing the absence of a genuine issue of material

fact as to an essential element of the non-moving party's case. *See Celotex Corp. v. Catrett,* 477

Case No. 1:10-CV-01902
Gwin, J.

U.S. 317, 323 (1986).  "A fact is material if its resolution will affect the outcome of the lawsuit."

*Martingale, LLC v. City of Louisville*, 361 F.3d 297, 301 (6th Cir. 2004).  The moving party meets

its burden by "informing the district court of the basis for its motion, and identifying those portions

of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to set

forth specific facts showing a triable issue.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986).  It is not sufficient for the nonmoving party merely to show that there is

some existence of doubt as to the material facts.  *See id.* at 586.  Nor can the non-moving party rely

upon mere allegations or denials of its pleadings.  Fed. R. Civ. P. 56(e).  In responding to a summary

judgment motion, the non-moving party "cannot rely on the hope that the trier of fact will disbelieve

the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a

properly supported motion for summary judgment."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472,

1477 (6th Cir.1989) (internal quotation omitted).

In deciding a motion for summary judgment, the Court views the factual evidence and draws

all reasonable inferences in favor of the non-moving party.  *Thomas v. Cohen*, 453 F.3d 657, 660

(6th Cir. 2004) (citations omitted). "The disputed issue does not have to be resolved conclusively

in favor of the non-moving party, but that party is required to present some significant probative

evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *60

Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz.

v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).  Ultimately the Court must decide "whether the

Case No. 1:10-CV-01902
Gwin, J.

evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Martingale*, 361 F.3d at 301.

### III. Analysis

*III.A  The Defendant's Motion to Strike the Expert Report of Jim Gilligan*

Before resolving the Defendant's motion for summary judgment, the Court will first resolves the Defendant's motion to exclude the expert testimony of Jim Gilligan under Federal Rule of Evidence 702. [Doc. 31.] The Defendants say that Gilligan lacks the proper qualifications to testify regarding defects in the chiller and the cause of its failure. [Doc. 32 at 3.] Moreover, the Defendant says that Gilligan's testimony is speculative, unsupported, and therefore not sufficiently reliable to be admissible. [*Id.* at 5.] The Plaintiff disputes these contentions, arguing that Gilligan has specialized knowledge due to his experience treating water systems and that Gilligan may opine on design defects in the chiller because those defects are casually connected to water treatment issues. [Doc. 35.]

Under Federal Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify" if the witness's testimony is "based upon sufficient facts or data, . . . is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. "Determining the admissibility of expert testimony pursuant to Rule 702 entails a flexible inquiry." *Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010). "[U]nder Daubert and its progeny, a party proffering expert testimony must show by a preponderance of proof that the expert whose testimony is being offered is qualified and will testify to scientific

Case No. 1:10-CV-01902
Gwin, J.

knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

i.  Gilligan's Qualification to Testify as an Expert

In order to qualify as an expert under Rule 702, a witness must establish his or her expertise by reference to "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. "Although this requirement is typically treated liberally, a witness is not an expert simply because he claims to be." *Rose*, 388 F. App'x at 533. "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). In *Berry*, the Sixth Circuit helpfully described the kinds of testimony witnesses are qualified to give based upon their expertise – whether that testimony be scientific or technical:

> The distinction between scientific and non-scientific expert testimony is a critical one.  By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness.  Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee.  Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
>
> On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions.  The foundation would not relate to his formal training, but to his firsthand observations.  In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Id.* at 1349-50.

Here, the relevant inquiry is whether Gilligan is qualified to testify regarding:  (1) water treatment practices and the efficacy of the Plaintiff's water treatment procedures in preventing corrosion; (2) general engineering and design theories about why the chiller unit failed; and (3)

-9-

Case No. 1:10-CV-01902
Gwin, J.

whether the engineering and design of the chiller was appropriate, particularly with regard to "saddle wear," flow rate and tube design, and the use of steel baffles with copper tubing.  [Doc. 20-1.]

In *Rose v. Truck Centers, Inc.*, the Sixth Circuit addressed the qualifications of truck mechanic, who possessed great expertise in repairing trucks, to testify regarding the design and engineering of a truck.  388 F. App'x 528 (6th Cir. 2010).  The Sixth Circuit upheld the exclusion of his testimony, holding that testimony reached far beyond his training as a truck mechanic.  For example, in explaining the cause of a truck accident, the expert testified that the accident was caused by a loss of power steering fluid due to loose valve housing bolts and that the design of the truck was defective for allowing this to happen.  *See Rose v. Truck Centers, Inc.*, 611 F. Supp.2d 745, 750-52 (N.D. Ohio 2009).  The Sixth Circuit held that the mechanic was not qualified to testify regarding the cause of the accident or whether the vehicle was designed defectively because, as a mechanic, he was not qualified to discuss these engineering issues.

The factual scenario and expert report is very similar in the current suit.  Here, Gilligan, a water treatment specialist with no engineering training, seeks to testify primarily about whether the chiller unit was engineered properly and whether that design contributed to the unit's failure.  Gilligan's opinion goes far beyond his expertise in the field of water treatment.  For example, in discussing the flow rate and the copper tube design, Gilligan says:

> Advantage does not employ the conventional engineering that I see day in and day out in the field in condensers.  Typically water passes straight through straight copper tubes close to half inch in diameter . . . Advantage uses very thin tubes, and at 1/4 inch, these tubes are much smaller than I usually see in condensers.  Advantage has the baffle plates in the water section of the condenser.  I have never seen this engineering in any other brand of commercial or industrial equipment . . . I know of no reason why Advantage would design an industrial chiller the way they did.  Using metal in the tubing and small tubes packed close together just seems like engineering that is looking for problems.  This equipment does not appear to be engineered for longevity.

-10-

Case No. 1:10-CV-01902
Gwin, J.

[Doc. 20-1 at 3-4.] Similarly, Gilligan ultimately concludes that he was "shocked by the engineering and design of the Advantage condenser" and that design flaws caused the chiller's failure. [*Id.* at 2.]

However, Gilligan is not qualified to offer opinions about whether the design of the chiller was defective.  Gilligan has not demonstrated that he knows any more about mechanical engineering principles than an average juror.  *See Berry*, 25 F.3d at 1350.  Gilligan has no engineering-related training or education.  [Doc. 32-3.]  Indeed, Gilligan even makes note of his lack of engineering knowledge in his expert report.  For example, he bases his conclusion on the chiller's inability to adequately move water on a "common sense standpoint," rather than on any specialized engineering knowledge.  [Doc. 20-1 at 4.]  Further, he states that his observations on the chiller are based on his experience in water treatment.  He writes, "[t]o make an analogy, I am more like an automobile mechanic than a design engineer at a Detroit auto manufacturer.  I see and have to work with a large variety of engineering in actual field applications.  I would be doing some guessing as to why an engineer designed equipment in such an unusual way." [*Id.* at 4.]  Just like the auto mechanic in *Rose* who could not testify about design defects and engineering flaws in a truck, Gilligan is not qualified to testify about design defects and engineering flaws in the chiller unit.  *See Rose*, 388 F. App'x at 533-35; *see also Early v. Toyota Motor Corp.*, 277 F. App'x 581, 585-87 (6th Cir. 2008) (holding that an engineer could not testify about alternative designs and design defects where his training had little relationship to the subject matter); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 2010 WL 2643417, at *3-4 (N.D. Ohio, July 1, 2010) (holding expert could not testify about forklift design, despite engineering degree, where expert did not have any training related to forklifts); *Elswick v. Nichols*, 144 F. Supp.2d 758, 766 (E.D.Ky. 2001) (holding that an expert on nursing standards of care could testify about standards of care, but not about causes of a surgery

-11-

Case No. 1:10-CV-01902
Gwin, J.

complication).  Nonetheless, the Court does find that Gilligan is qualified to testify as an expert regarding water treatment and the efficacy of certain water treatment practices in preventing corrosion, as his thirty years of experience in the water treatment industry more than qualify him to discuss that topic.  [Doc. 32 at 4.]

ii.   Reliability of Gilligan's Conclusions

Federal Rule of Evidence 702 requires an expert witness to testify as to "scientific, technical, or other specialized knowledge."  Fed.R.Evid. 702.  As the Supreme Court in *Daubert* noted, this requirement establishes a standard of "evidentiary reliability" or "trustworthiness."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 n. 9, (1993).  District courts must determine whether "the principles and methodology underlying the [proffered expert's] testimony itself are valid."  *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000).

Expert testimony may not be based on mere speculation.  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800-01 (6th Cir. 2000).  Moreover, any assumptions made must be supported by evidence in the record.  *See Sigler*, 532 F.3d at 481-82.  An expert's conclusions regarding causation must have a factual basis and cannot be premised on mere suppositions.  *McLean*, 224 F.3d at 801.  "[M]ere 'weaknesses in the factual basis of an expert witness' opinion . . . [however,] bear on the weight of the evidence rather than on its admissibility.' "  *Id.* (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993)) (alteration in original).  In *Daubert*, the Court set out several factors to be considered in determining whether an expert's testimony is reliable:  the ability to test the expert's hypotheses, whether the expert's methodology has been subjected to peer review and publication, the known or potential rate of error with respect to the expert's methodology, and whether the methodology is generally accepted in the scientific community.  *Daubert*, 509 U.S. at

Case No. 1:10-CV-01902
Gwin, J.

593-94; *Rose*, 388 F. App'x at 533.  The *Kumho* Court also made clear that the factors listed above do not constitute a "definitive checklist or test," particularly in the engineering context.  *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 150 (1999).

    With regard to Gilligan's testimony related to water treatment practices, the Court finds that the testimony is sufficiently reliable.  First, although Gilligan did not personally examine the water solution used in the chiller, it is apparent from his report that Gilligan was told by the Plaintiff the type of solution used.  It is not necessary for an expert witness to base their testimony on first-hand knowledge; rather, it is permissible for Gilligan's statements regarding the type of water treatment used in the chiller to be based upon the Plaintiff's representations to him.  Fed.R.Evid. 703.  Second, although the type of information that Gilligan testifies to is unlikely to be the subject of an academic journal article, his conclusions regarding the efficacy of particular water treatment options and solutions in preventing corrosion are easily testable and have been subject to industry-wide review.  Finally, although not a factor listed in *Daubert*, the Court finds that Gilligan's qualification as a successful water treatment specialist for over thirty years weighs heavily in favor of finding that the basis of his knowledge and professional conclusions in this area are based upon reliable information.

    However, the Court finds that Gilligan's conclusions regarding the engineering and design of the chiller unit are inherently unreliable.  The only bases in fact that Gilligan cites as a foundation for his conclusions is his visual inspection of the chiller in late 2010 and his review of the report of Pruckorius & Associates regarding the failure.  [Doc. 20-1.]  Otherwise, Gilligan seems to rely upon his own conclusions and "common-sense" in determining if the chiller's engineering and design is proper.  He cites no studies or data to explain his conclusions that the chiller unit was designed in a manner that cased "saddle wear," galvanic corrosion, and otherwise operate improperly.  Further,

Case No. 1:10-CV-01902
Gwin, J.

he conducted no tests to determine if alternative designs could have been used.  As such, the Court finds that even if Gilligan is qualified to testify regarding the design of the chiller that his testimony on the subject is not sufficiently reliable to be admissible under the *Daubert* framework.  *See, e.g., Rose*, 388 F. App'x at 534-35 (finding similar testimony not sufficiently reliable); *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006) (finding expert's testimony not reliable where expert lacked rudimentary understanding of the subject matter); *Kilgore v. Carson Pirie Holdings, Inc.*, 205 F. App'x 367, 371 (6th Cir. 2006) (testimony not reliable where it has no basis in the record).  Nevertheless and if otherwise relevant, Gilligan may be able to testify regarding his observations about alternative chiller designs that he has worked with, as this information is based upon his own first-hand knowledge.

To conclude, the Court **DENIES** the Defendant's motion to the extent that Gilligan testifies regarding alternative water treatment systems and practices, whether corrosion can be prevented through certain types of water treatment, and water treatment more generally. The Court finds that Gilligan is sufficiently qualified to testify regarding water treatment practices and that his testimony is sufficiently reliable in this area to be admissible.  Gilligan may also testify regarding his observations on normal chiller designs.  However, the Court **GRANTS** the Defendant's motion to exclude all other testimony in Gilligan's report.  By his own admission, Gilligan is not an engineering expert and does not possess the requisite knowledge to testify regarding the design and engineering of the chiller and whether the machine was properly designed.  Thus, in deciding the Defendants' motion for summary judgment, the Court will consider only those portions of Gilligan's report that are directly related to water treatment practices.

*III.B   Are There Issues of Material Fact Regarding Causation?*

Case No. 1:10-CV-01902
Gwin, J.

Having resolved the Defendant's motion to exclude Gilligan's testimony, the Court will now proceed to the Defendant's motion for summary judgment. [Doc. 22.] The Defendant says that since causation is an element of every claim brought by the Plaintiff, and because there are no factual disputes regarding whether it caused the chiller's failure, that summary judgment is appropriate on all counts. [Doc. 23 at 14.] Defendant Advantage says the undisputed evidence shows that the Plaintiff's negligence in not properly treating the water used in the chiller caused the system's corrosion and failure. [Id.] Plaintiff Chemical Solvents, by contrast, says that summary judgment is not appropriate because there are factual disputes regarding the cause of the holes in the copper tubes. [Doc. 29.]

After considering the party's submissions, the Court finds that there are unresolved issues of material fact that would make granting the Defendant's motion for summary judgement inappropriate. First, on the issue of the cause of the holes and corrosion in the tubing, it is currently unclear from the record what exactly caused the holes and the extensive corrosion to develop. The Defendant contends that impurities in the chiller water caused the corrosion and that the Plaintiff was negligent in failing to treat the water. [Doc. 21-1 at 30; Doc. 23 at 14.] In contrast, Plaintiff says that the corrosion was caused by the proximity of copper and steel in the tubing and baffles, which led to galvanic corrosion, and that it was not possible to prevent this sort of corrosion through water treatment. [Doc. 20-1; Doc. 27-1; Doc. 28-1.] Taking the disputed facts in the light most favorable to the non-movant, the Court finds that there is a material issue of fact regarding whether the Plaintiff's conduct caused the degradation of the copper tubing.

Second, even if the Plaintiff's use of improperly treated water caused the corrosion, the Court finds that there are issues of fact regarding whether Advantage should have equipped the system with

-15-

Case No. 1:10-CV-01902
Gwin, J.

a filter, or otherwise ensured that the system was installed with a proper water treatment device during the installation process. Bruce Bene testifies that part of the purchase price of the chiller included an inspection of the chiller by an Advantage employee and also included custom designed plans for installation of the unit. [Doc. 29-2 at 12-14.] It seems completely reasonable, at least from the Court's standpoint, for Chemical Solvents to rely upon Advantage to at least inform it of the possibility of water causing fatal corrosion, given that Chemical Solvents contracted for these installation-related services. In contesting this point, Advantage relies heavily upon the user's manual for the chiller, provided to the Plaintiff as part of the purchase. [Doc. 23 at 15.] The manual includes a provision stating that it is the responsibility of the owner to ensure that the water used in the chilling system is properly treated and that Advantage disclaims all responsibility for system failure due to inadequate water treatment. [Doc. 23-4.] However, the Court is not persuaded that a single page in an owner's manual absolves Advantage of all responsibility to ensure that the water used in the unit was properly treated where Advantage created a custom installation plan – which conspicuously does not include a filter – and dispatched its own employee to inspect the installation and functioning of the machine prior to its use.

Third, and most importantly, the Court finds that there is evidence on the record suggesting that the Titan chiller was defectively designed. First, Gilligan testifies that based upon his experience treating water used in boilers and chillers that there was no anti-corrosion solution that would have prevented the corrosion that occurred in the chiller. [Doc. 20-1.] The Defendant's expert, Brett Miller, disputes this claim, but if the jury credits Gilligan's testimony, the jury could find that the chiller was destined to decay without a filter. [Doc. 27-1.] It seems unreasonable to design a chiller that will surely fail without a particular filter, and then not include that filter as part

-16-

Case No. 1:10-CV-01902
Gwin, J.

of the actual chiller unit.  Second, although the parties largely ignore this issue in their briefing,

James Datillo testifies that one of the primary reasons that Chemical Solvents purchased the Titan

unit was because Advantage represented that the chiller had a computer system that would shut the

unit down should a Freon leak occur.  [Doc. 29-1 at 7-8.]  However, on the day that the system

failed, none of the fail-safe mechanisms functioned properly, and instead the chiller overheated to

the point that the entire unit was destroyed.  [Doc. 29 at 12-13; Doc. 29-1 at 8.][2/]  It is unclear why

the warnings and automatic shut-offs did not function properly, but a reasonable jury could conclude

that the failure was due to defective design or a manufacturing error.

Accordingly, because the Court finds that there are various unresolved issues of material fact

regarding the cause of the chiller failure, whether the Defendant should have informed the Plaintiff

of the potential water treatment issues, and whether the chiller was defectively designed, the Court

rejects the Defendant's contention that it is entitled to summary judgment on these grounds.

*III.C  Privity*

Second, the Defendants says that Counts 1-3 of the complaint – breach of contract, breach

of implied warranty of fitness for a particular purpose under O.R.C. § 1302.28, and breach of implied

warranty of merchantability under O.R.C. § 1302.27 – must be dismissed because there is no privity

between Defendant Advantage and Plaintiff Chemical Solvents.  [Doc. 23 at 16.]  In response, the

Plaintiff says there are unresolved issues of material fact bearing on whether privity of contract

existed between it and the Defendant.  [Doc. 29 at 18.]

--------

[2/] The Defendant's reply to this argument entirely misses the point.  The Defendant argues that the failure of the alarms and emergency shut-off to function properly is "irrelevant" because the failure of the alarms did not cause the holes in the copper tubing that allowed the Freon leak.  [Doc. 33 at 11.] Obviously the alarm system did not cause the holes in the copper tubing.  However, Datillo testifies that a major reason the Plaintiff purchased the chiller was because Advantage represented it was equipped with an alarm system that would prevent systemic failure should a Freon leak occur.  [Doc. 29-1 at 7-8.]

-17-

Case No. 1:10-CV-01902
Gwin, J.

Generally, privity of contract is a prerequisite for claims brought under breach of contract or breach of warranty theories.  *See* *Resource Title Agency, Inc. v. Morreale Real Estate Services, Inc.,* *314 F. Supp.2d 763, 770 (N.D. Ohio 2004)* ("It is well established that a contract is binding only upon parties to a contract and those in privity with them"*)*; *Flex Homes, Inc. v. Ritz-Craft Corp. of Michigan, Inc.,* *721 F. Supp.2d 663, 673 (N.D. Ohio 2010)* ("under Ohio law, privity of contract is generally a prerequisite to a breach of the implied warranties of merchantability and fitness for a particular purpose"); *McKinney v. Bayer Corp.,* *744 F. Supp.2d 733, 756 (N.D. Ohio 2010)* ("Under Ohio law, privity of contract is generally a prerequisite to a claim for breach of the implied warranty of merchantability.").

The Defendant argues that there was no privity of contract between it and the Plaintiff because Chemical Solvents purchased the chiller from BruceAir, and not Defendant Advantage directly.  [Doc. 23 at 16.]   In support of this point, Advantage notes that during the negotiation process that it specifically rejected an arrangement whereby Chemical Solvents would purchase the chiller directly from Advantage and Advantage would then pay BruceAir a commission.  Instead, BruceAir purchased the chiller from Advantage and then resold it to Chemical Solvents with a mark-up.  [*Id.* at 16-17.]

Although this would seemingly resolve the issue in the Defendant's favor, the Court finds that there remain unresolved issues of material fact regarding whether the Plaintiff and Defendant were in privity with one another.   Under Ohio law, a consumer may also have privity of contract with the manufacturer if that consumer is an intended third-party beneficiary to a contract. *Am. Rock Mechanics, Inc. v. Thermex Energy Corp.,* *608 N.E.2d 830, 833 (Ohio Ct. App. 1992)*.   "A third-party beneficiary is one for whose benefit a promise is made, but who is not a party to the

-18-

Case No. 1:10-CV-01902
Gwin, J.

contract encompassing the promise." *Berge v. Columbus Community Cable Access*, 736 N.E.2d 517, 532 (Ohio Ct. App. 1999). In *Hill v. Sonitrol*, the Ohio Supreme Court adopted an "intent to benefit" test to determine whether a party is an intended, or merely an incidental, third-party beneficiary. 521 N.E.2d 780 (Ohio 1988). "Under this analysis, if the promisee . . . intends that a third party should benefit from the contract, then that third party is an 'intended beneficiary' who has enforceable rights under the contract. If the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an 'incidental beneficiary,' who has no enforceable rights under the contract . . . [T]he mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary.' " *Id.* at 784-85 (quoting *Norfolk & W. Ry. Co. v. United States*, 641 F.2d 1201, 1208 (6th Cir. 1980)).

Here, Advantage knew throughout the entire negotiation process that the actual user and purchaser of the chiller was Chemical Solvents. For example, Chemical Solvents representatives visited Advantage's facility in Indiana to discuss the chiller unit and to determine whether the unit met Chemical Solvents' needs. [Doc. 29-1 at 6-7; Doc. 29-2 at 5-6.] Additionally, the chiller was shipped to Chemical Solvents directly, the purchase included a custom installation plan based upon the Plaintiff's facilities, and an Advantage representative visited the Plaintiff to inspect the installation. [Doc. 29-2 at 12-17.] This information, taken in the light most favorable to the Plaintiff, indicates that there may have been privity between Advantage and Chemical Solvents. *See Bobb Forest Products, Inc. v. Morbark Industries, Inc.*, 783 N.E.2d 560 (Ohio Ct. App. 2002) (finding privity of contract between a third party and a manufacturer where the manufacturer knew that the third party was the intended beneficiary of sales contract); *Nationwide Ins. Co. v. Case*

-19-

Case No. 1:10-CV-01902
Gwin, J.

*Corp.*, 2002 WL 31500585, at *7 (Ohio Ct. App., Nov. 12, 2002) ("In limited circumstances, the manufacturer of a good and the consumer of the good may be in privity of contract where the manufacturer is so involved in the sales transaction that the distributor merely becomes the agent of the manufacturer").  Because there are unresolved material issues of fact bearing on whether there was privity between the Plaintiff and Defendant, the Court rejects this argument.

### III.D  Preemption of Claims

The Defendant also contends that the Plaintiff's breach of implied warranty and negligent workmanship claims (Counts 4 & 5) are preempted by the Ohio Products Liability Act (OPLA). O.R.C. §§ 2307.71-2307.80.  The Defendant says that since the statute abrogates all common law product liability claims, that these claims are precluded and must be dismissed.  [Doc. 23 at 17-18.] In response, the Plaintiff argues that the preemption language in the statute does not apply to these claims because it is only seeking economic damages and because those claims are not "products liability" claims within the purview of the statute. The Court finds that the Plaintiff's claim for implied warranty of merchantability is preempted by the OPLA, but its claim for negligent workmanship is not.

The OPLA states that "Sections 2307.71 to 2307.80 of the Revised Code are intended to abrogate all common law product liability claims or causes of action." O.R.C. § 2307.71(B). Consistent with other district courts that have addressed the abrogation provision, the Court finds that implied common law warranty claims are products liability claims subject to abrogation, whereas those based upon the Uniform Commercial Code are not.  *See Miles v. Raymond*, 612 F. Supp.2d 913, 922-23 (N.D. Ohio 2009) (holding that the statute preempts common law warranty causes of action, but does not preempt U.C.C. based warranty claims); *CCB Ohio LLC v. Chemque,*

Case No. 1:10-CV-01902
Gwin, J.

*Inc.*, 649 F. Supp.2d 757, 763-64 (S.D. Ohio 2009) ("The Court finds well-taken, however, the argument that Plaintiffs' warranty claims can find a basis grounded in the Uniform Commercial Code and therefore are not claims abrogated by the OPLA"); *Miller v. ALZA Corp.*, 2010 WL 5287514, at *12 (S.D. Ohio, Dec. 17, 2010) (holding that warranty claims not brought under O.R.C. Chapter 1302 are abrogated); *Evans v. Hanger Prosthetics & Orthotics, Inc.*, 735 F. Supp.2d 785, 797 (N.D. Ohio 2010) (holding that common law breach of warranty claim must be dismissed); *Mitchell v. Proctor & Gamble*, 2010 WL 7282222, at *3 (S.D. Ohio, Mar. 1, 2010) ("The OPLA has been held to abrogate claims for strict products liability, negligent failure to warn, breach of express warranty, and breach of implied warranty"). Thus, consistent with these prior holdings, the Court finds that the Plaintiff's common law claim for breach of implied warranty is abrogated by the OPLA. The Court, therefore, **GRANTS** the Defendant's motion to dismiss Count 4 of the complaint.[3/]

However, the Court finds that the Plaintiff's claim for negligent workmanship is not preempted by the OPLA. Although the parties cite no case law specifically discussing the abrogation

---

[3/] The Court also finds that this claim must be dismissed because the claim seeks to recover only economic losses. [Doc. 23 at 18.] In making this argument, the Defendant relies upon *Midwest Ford, Inc. v. CT Taylor Company, Inc.*, 694 N.E.2d 114 (Ohio Ct. App. 1997), for the proposition that commercial parties may not recover under a common law implied warranty theory for economic losses.

The Sixth Circuit addressed this issue in *HDM Flugservice GmbH v. Parker Hannifin Corp.*, holding that under Ohio state law that commercial parties – both in and out of privity – are subject to the economic loss rule, which bars common law implied warranty claims among commercial parties. 332 F.3d 1025, 1029-30 (6th Cir. 2003); *see also Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 635 (Ohio 1989) ("In summary, we hold that a commercial buyer seeking recovery from the seller for economic losses resulting from damage to the defective product itself may maintain a contract action for breach of warranty under the Uniform Commercial Code; however, in the absence of injury to persons or damage to other property the commercial buyer may not recover for economic losses premised on tort theories of strict liability or negligence.").

In reaching this holding, the Sixth Circuit wrote that "the U.C.C. provides a comprehensive scheme for parties to recover their economic losses . . . [and that p]ermitting commercial parties to recover economic losses in tort would allow a purchaser to reach back up the production and distribution chain, thereby disrupting the risk allocations that have been worked out in the transactions comprising the chain." *HDM*, 332 F.3d at 1030. Thus, whether or not Advantage and Chemical Solvents are in privity of contract with each other, the Court finds that Count 4 of the complaint must be dismissed as a matter of law. The Court, therefore, alternatively **GRANTS** the Defendant's motion for summary judgment on Count 4 of the complaint on this grounds.

Case No. 1:10-CV-01902
Gwin, J.

of negligent workmanship claims under the OPLA – and the Court is aware of none – the basis for

recovery for negligent workmanship suggests that such a claim is not subject to abrogation as a

"products liability claim."  The duty to perform in a workmanlike manner is imposed by common

law upon builders and contractors, *Mitchem v. Johnson*, 218 N.E.2d 594, 594-98 (Ohio 1966), and

the duty has been extended to service contracts.  *Day-Glo Color Corp. v. Brewer-Garrett Co.*, 2007

WL 117495 at *1-2 (Ohio Ct. App., Jan. 18, 2007).  In this count, the Plaintiff is not saying that the

product itself was defective, but that Advantage acted negligently in servicing the chiller at the time

of installation and at the one-year service.  Thus, this is not a "products liability" claim, but a claim

premised upon subsequent negligent actions by Advantage.  Accordingly, the Court finds this claim

is not preempted by the OPLA.  *See CCB Ohio*, 649 F. Supp.2d at 763-64 ("Similarly, the Court

finds actions for fraud and negligent misrepresentation as outside the scope of the OPLA's

abrogation, as neither fit neatly into the definition of a 'common law product liability claim.'").

*III.E   Negligence for Failure to Perform in a Workmanlike Manner*

Finally, Defendant Advantage says that the Plaintiff's claim for failure to perform in a

workmanlike manner (Count 5) must be dismissed because it is actionable under the facts of this

suit.  [Doc. 23 at 18-19.]

The duty to perform in a workmanlike manner is imposed by common law upon builders and

contractors.  *Mitchem*, 218 N.E.2d at 594-98; *Barton v. Ellis*, 518 N.E.2d 18, 20 (Ohio Ct. App.

1986).  Courts determine whether a breach of the implied duty occurred by assessing fault and

addressing factual issues on whether the defendant utilized proper materials and workmanlike skill

and judgment.  *Id.*  Additionally, this duty is also imposed in service contracts.  *Day-Glo Color*

*Corp.*, 2007 WL 117495 at *1-2.  Here, Bruce Bene testified that the purchase price of the chiller

-22-

Case No. 1:10-CV-01902
Gwin, J.

included an installation inspection and a one-year service. [Doc. 29-2 at 13-14.] It is undisputed that

Advantage performed the start-up installation, and it is not clear whether the one year inspection

occurred. [*Id.*] However, it is unclear exactly what the terms of this service where and whether they

were imposed by contract.  The Court finds, relevant to this motion, that the Plaintiff offers enough

facts to create a material issue of fact, and therefore, rejects this argument as a grounds for summary

judgment.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the

Defendant's motion to exclude the testimony of Jim Gilligan.  Gilligan may testify regarding water

treatment systems and practices and the efficacy of certain water treatment options; however, the

Court **GRANTS** the motion in all other regards and excludes all other testimony offered by Gilligan

for lack of proper qualifications and reliability.  The Court also **GRANTS IN PART** and **DENIES**

**IN PART** the Defendant's motion for summary judgment.  The Court **GRANTS** the motion with

regard to Count 4 of the complaint (breach of implied warranty under the common law) and

**DENIES** the motion in all other respects.

IT IS SO ORDERED.


Dated: April 6, 2011                                    s/      *James S. Gwin*
                                                       JAMES S. GWIN
                                                       UNITED STATES DISTRICT JUDGE